**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- x

EMINAH PROPERTIES LLC, a New York
Company, and MY BATTERY SUPPLIER LLC, a
New York Company;

       Plaintiffs,

  v.

ENERGIZER HOLDINGS, INC., a Delaware
Corporation; ENERGIZER BRANDS, LLC, a
Delaware Company, and DOES 1-10,

       Defendants.

--------------------------------------------------------------- x

Case No. 1:20-cv-00148-AMD-CLP

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND .................................................................................2

    A.    The Parties ..................................................................................................2

    B.    Energizer's Breach of Contract....................................................................2

    C.    Energizer's Baseless Legal Threats and Filing of False IP Complaints .................4

    D.    Procedural History .......................................................................................5

III.  LEGAL STANDARD...............................................................................................6

IV.   THE SAC ADEQUATELY PLEADS CLAIMS I–III CONCERNING
    ENERGIZER'S BREACH OF CONTRACT ...................................................................6

    A.    The SAC Sufficiently Pleads a Claim for Breach of Contract (Count I)................6

        1.    The Parties Agreed on All Material Terms for the Purchase of the
            Rayovac Overstock ....................................................................7

        2.    The Parties Agreed on All Material Terms for the Distribution of
            Energizer Products ...................................................................8

        3.    The Parties Had a Meeting of the Minds ......................................9

        4.    Energizer's Exhibits Only Highlight Its Bad Faith and Attempts to
            Breach the Agreement................................................................11

        5.    The Parties' Agreement Is Not Precluded by the Statute of Frauds .........13

            a)    The Parties' E-mails Satisfy the Statute of Frauds .......................13

            b)    Plaintiffs' Partial Performance Renders the Statute of
                Frauds Irrelevant ..............................................................14

    B.    The SAC Sufficiently Pleads a Claim for Fraudulent Inducement
        (Count III)................................................................................15

    C.    The SAC Sufficiently Pleads a Claim, in the Alternative, for Unjust
        Enrichment (Count II)...............................................................17

V.      THE SAC SUFFICIENTLY PLEADS COUNTS IV–VIII CONCERNING THE
        FALSE EBAY REPORTS ................................................................................................18

        A.      The SAC Sufficiently Pleads a Lanham Act Section 43(a) Claim
                (Count IV) ..........................................................................................................18

                1.      Energizer's False Statements Were Sufficiently Disseminated ................20

                2.      The SAC Adequately Pleads that Plaintiffs Suffered Damages Due
                        to Energizer's False eBay Reports ..........................................................21

        B.      The SAC Sufficiently Pleads a Claim for Unfair Competition Under
                New York Common Law (Count V) ....................................................................22

        C.      The SAC Sufficiently Pleads a Claim for Tortious Interference with
                Contract and Business Relationship (Count VI) ....................................................23

        D.      The SAC Sufficiently Pleads a Claim for Defamation (Count VII) .....................24

        E.      The SAC Sufficiently Pleads a Claim for Trade Libel (Count VIII) ....................25

VI.     CONCLUSION ............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adore Me, Inc. v. NPC Global Corp.*,
  No. 18cv4498 (DLC),
  2019 U.S. Dist. LEXIS 126205 (S.D.N.Y. July 29, 2019) .......................................................8

*Advance 2000, Inc. v. Harwick*,
  No. 16-CV-1037S,
  2019 U.S. Dist. LEXIS 213326 (W.D.N.Y. Dec. 11, 2019)...................................................23

*Al-Bawaba.com, Inc. v. Nstein Techs. Corp.*,
  862 N.Y.S.2d 812 (N.Y. Sup. Ct. Apr. 25, 2008)...................................................................14

*Am. Broad. Co. v. Maljack Prods., Inc.*,
  34 F. Supp. 2d 665 (N.D. Ill. 1998) .......................................................................................21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................................6

*Baiqiao Tang v. Wengui Guo*,
  No. 17 Civ. 9031 (JFK),
  2019 U.S. Dist. LEXIS 201807 (S.D.N.Y. Nov. 20, 2019)....................................................22

*Barretti v. Detore*,
  944 N.Y.S.2d 166 (N.Y. App. Div. 2d Dep't 2012) ...............................................................15

*Beautiful Jewellers Private, Ltd. v. Tiffany & Co.*,
  No. 06 Civ. 3085 (KMW),
  2007 U.S. Dist. LEXIS 20263 (S.D.N.Y. Mar. 21, 2007) ...............................................14, 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................................6

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
  448 F.3d 573 (2d Cir. 2006)....................................................................................................17

*Brook, Weiner, Sered, Kreger, & Weinberg v. Coreq, Inc.*,
  No. 91 C 7955,
  1994 U.S. Dist. LEXIS 11401 (N.D. Ill. Aug. 3, 1994)..........................................................16

*CCM Rochester, Inc. v. Federated Inv'rs, Inc.*,
  No. 14-CV-3600 (VEC),
  2014 U.S. Dist. LEXIS 165136 (S.D.N.Y. Nov. 25, 2014)....................................................17

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980)...........................................................................................................19

*CUnet, LLC v. Quad Partners, LLC*,
No. 16-cv-6327 (CM),
2017 U.S. Dist. LEXIS 36930 (S.D.N.Y. Mar. 7, 2017) ..........................................14

*Display Works, LLC v. Pinnacle Exhibits, Inc.*,
No. WMN-15-2284,
2015 U.S. Dist. LEXIS 158346 (D. Md. Nov. 24, 2015) ..........................................21

*Energizer Brands, LLC v. My Battery Supplier, LLC*,
No. 1:19-CV-6486-AMD-CLP (E.D.N.Y.) ........................................................5, 8

*Fakhoury Enters., Inc. v. J.T. Distribs.*,
No. 94 Civ. 2729 (PKL),
1997 U.S. Dist. LEXIS 7667 (S.D.N.Y. June 2, 1997)...............................................7

*Garmon Corp. v. Vetnique Labs, LLC*,
No. 19 C 8251,
2020 U.S. Dist. LEXIS 108603 (N.D. Ill. June 22, 2020) ........................................21

*Globaltex Grp., Ltd. v. Trends Sportswear, Ltd.*,
No. 09-CV-235 (JBW),
2009 U.S. Dist. LEXIS 38302 (E.D.N.Y. May 4, 2009) .............................................9

*Greenfield v Philles Records*,
780 N.E.2d 166 (2002)............................................................................................10

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010).......................................................................................6

*Henry L. Fox Co. v. William Kaufman Org., Ltd.*,
542 N.E.2d 1082 (1989).............................................................................................13

*Ipcon Collections LLC v. Costco Wholesale Corp.*,
698 F.3d 58 (2d Cir. 2012).........................................................................................15

*Italian & French Wine Co. v. Negociants U.S.A.*,
842 F. Supp. 693 (W.D.N.Y. 1993) ............................................................................9

*Ivy League Sch., Inc. v Danick Indus., Inc.*,
999 N.Y.S.2d 797 (N.Y. Sup. Ct. 2014) .................................................................23

*In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019)......................................................................19

*L. Fatato, Inc. v. Miller Brewing Co.*,
    582 F. Supp. 1377 (E.D.N.Y. 1984) ........................................................................18

*Last Time Beverage Corp. v. F &V Distrib. Co.*,
    951 N.Y.S.2d 77 (N.Y. App. Div. 2d Dep't 2012) ...........................................14, 15

*Leibowitz v. Cornell Univ.*,
    584 F.3d 487 (2d Cir. 2009)......................................................................................6

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)....................................................................................15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)................................................................................................18

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*,
    880 F. Supp. 1005 (S.D.N.Y. 1994).......................................................................20

*Navika Capital Grp., LLC v. Doe*,
    No. 14 CV 5968 (DLI) (CLP),
    2017 U.S. Dist. LEXIS 2926 (E.D.N.Y. Jan. 6, 2017),
    *adopted*, 2017 U.S. Dist. LEXIS 40820 (Mar. 20, 2017) ...............................24, 25

*New World Trading Co. v. Avshalomov*,
    No. 11 Civ. 6219 (SAS),
    2012 U.S. Dist. LEXIS 137823 (S.D.N.Y. Sept. 24, 2012)......................................8

*Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.*,
    807 F. Supp. 337 (S.D.N.Y. 1992) ......................................................................9, 11

*Pelonis USA, Ltd. v. Del-Rain Corp.*,
    No. 94-CV-587S(F),
    2000 U.S. Dist. LEXIS 15279 (W.D.N.Y. Sept. 5, 2000) .....................................11

*Pinkava v. Yurkiw*,
    882 N.Y.S.2d 687 (N.Y. App. Div. 2d Dep't 2009) ..............................................14

*Rogers v. HSN Direct Joint Venture*,
    97 Civ. 7710 (LLS),
    1999 U.S. Dist. LEXIS 12111 (S.D.N.Y. Aug. 5, 1999).........................................9

*Selective Beauty SAS v. Liz Claiborne, Inc.*,
    No. 09 Civ. 9764 (RMB) (HBP),
    2010 U.S. Dist. LEXIS 154890 (S.D.N.Y. May 26, 2010)..................................6, 9

*Seven–Up Co. v. Coca–Cola Co.*,
    86 F.3d 1379 (5th Cir. 1996) .................................................................................20

*Shaftel v. Dadras*,
    39 F. Supp. 2d 217 (E.D.N.Y. 1999) ......................................................................13

*Shop Vac Corp. v. BCL Magnetics Ltd.*,
    No. 04-CV-262,
    2005 U.S. Dist. LEXIS 26199 (N.D.N.Y. Oct. 24, 2005) ......................................11

*Sofi Classic S.A. de C.V. v. Hurowitz*,
    444 F. Supp. 2d 231 (S.D.N.Y. 2006) ....................................................................17

*Unicorn Global, Inc. v. GoLabs, Inc.*,
    No. 3:19-CV-0754-N,
    2020 U.S. Dist. LEXIS 48315 (N.D. Tex. Mar. 20, 2020) ....................................21

*VG Innovations, Inc. v. Minsurg Corp.*,
    No. 8:10-cv-1726,
    2011 U.S. Dist. LEXIS 41756 (M.D. Fla. Apr. 18, 2011) ....................................20

*Vinifera Imps. Ltd. v. Societa Agricola Castello Romitorio SRL*,
    No. 2:16-cv-00103 (ADS)(ARL),
    2020 U.S. Dist. LEXIS 43374 (E.D.N.Y. Mar. 12, 2020) ....................................13

*Vitamins Online, Inc. v. HeartWise, Inc.*,
    207 F. Supp. 3d 1233 (D. Utah 2016) ....................................................................21

**Statutes and Rules**

15 U.S.C. § 1125(a)(1) ..............................................................................................19

Fed. R. Civ. P. 9(b) ..................................................................................................15

Plaintiffs Eminah Properties LLC ("Eminah") and My Battery Supplier LLC ("MBS") (collectively, "Plaintiffs") respectfully submit this Opposition to Defendants Energizer Holdings, Inc. ("Energizer Holdings") and Energizer Brands, LLC's ("Energizer Brands") (collectively, "Energizer") Motion to Dismiss the Second Amended Complaint (ECF No. 24, "Motion").

## I.    INTRODUCTION

In early 2019, Energizer found itself sitting on a large quantity of overstock Rayovac-brand rechargeable batteries (about 1.5 million cells) that it desperately needed to get off its books prior to the close of the fiscal year.  Energizer approached Plaintiffs—battery distributors owned and operated by Hershel Brach—and asked for Plaintiffs' assistance in selling off the lot.  After initially declining the deal, Plaintiffs agreed to the purchase, provided that Energizer establish Plaintiff Eminah as a distributor for Energizer-brand products.  Following several weeks of negotiation, a deal was reached in early May 2019.  Although it accepted over $230K from Eminah towards the deal (and repeatedly expressed appreciation to Plaintiffs for bailing Energizer out of tough spot), Energizer refused to honor its obligations in all respects—it never delivered the majority of the Rayovac batteries or opened up Eminah as an Energizer distributor.

Adding insult to injury, when Plaintiffs attempted to revive discussions, Energizer resorted to childish threats, harassment and defamation.  Among other things, Energizer interfered with Plaintiffs' activities on online marketplaces, including filing false reports of intellectual property infringement with eBay.  The purpose of these reports—which remain as black marks on Plaintiffs' accounts to this day—was to disrupt and damage Plaintiffs' legal right to resell genuine Energizer products.  Accordingly, Plaintiffs also seek damages and injunctive relief for Energizer's unfair competition, tortious interference, defamation and trade libel.

The 242-paragraph Second Amended Complaint (ECF No. 22, "SAC") goes far beyond the requirements of notice pleading—it explains precisely why Plaintiffs are entitled to relief.

Seeking to impose needless delay and cost, Energizer has moved to dismiss each of Plaintiffs' eight claims.  For the reasons discussed below, Energizer's scattershot Motion should be denied.

## II.        FACTUAL BACKGROUND

### A.        The Parties

In 2008, Hershel Brach, joined by members of his family, formed a business for distributing name brand and private label batteries.  The purpose of Plaintiffs' business, which operates under the Eminah and MBS companies, was to, among other things, acquire and re-sell batteries. Plaintiffs resell batteries through various channels, including an e-commerce website, an Amazon.com ("Amazon") storefront and an eBay.com ("eBay") storefront.

Energizer markets and sells consumer and commercial batteries under various brands, including, the ENERGIZER brand ("Energizer Batteries") and the RAYOVAC brand ("Rayovac Batteries) (collectively, "Energizer Products").

### B.        Energizer's Breach of Contract

The Parties here are not strangers to one another.  Over the years, they have had various interactions, including discussions towards Plaintiffs becoming direct customers of Energizer Batteries.  As discussed below, in early 2019, they entered into an agreement, relating to the: (1) distribution of Energizer Batteries; and (2) purchase of a large quantity of overstock Rayovac Batteries ("the Agreement").  Energizer breached the Agreement and the instant lawsuit followed.

Briefly, in March 2019, Mr. Brach was contacted by Energizer employees Katherine Stein and Krista Garcia, both account managers, regarding a large quantity of overstock Rayovac rechargeable batteries ("Rayovac Overstock") that Energizer was desperate to sell.  (SAC ¶ 27, Ex. A.)  Energizer explained that the Rayovac Overstock offer was a "take all" deal, i.e., the entire lot had to be purchased in one shot.  (*Id.*)  Ms. Stein and Ms. Garcia represented that Energizer needed to sell-off the Rayovac Overstock before closing its financial records for the fiscal year in

September 2019.  (*Id.* ¶ 28.)  Eminah initially declined—the price was too high for the type of batteries offered in that quantity and Eminah did not have an immediate need for the batteries.  (*Id.* ¶ 29.)  But, throughout March and April 2019, Energizer persisted.  Ultimately, Eminah offered to purchase the Rayovac Overstock, provided that it would become a direct distributor of Energizer Batteries.  (*Id.* ¶¶ 30–32.)  On May 1, 2020, Energizer accepted the offer.  Specifically, Ms. Garcia acknowledged Eminah's offer and stated that Brad Sellenriek, an Energizer Holdings Sales Manager, "will start the process to get you set up" as a distributor.  (*Id.* ¶ 33, Ex. D.)  The same day, Mr. Sellenriek contacted Mr. Brach "regarding getting set up as a Energizer Distributor" and stated he "look[ed] forward to getting set up . . . ."  (*Id.* ¶ 34, Ex. E.)

The Agreement was a significant commitment for Eminah—the deal required Eminah to allocate funds, hire additional staff, and pass on other business opportunities in order to complete the transaction.  (*Id.* ¶ 36, Ex. F.)  Therefore, on May 3, 2019, Mr. Brach again requested confirmation "that we have a done deal," i.e., "that the deal is complete on both ends" (the Rayovac Overstock and Energizer distribution).  (*Id.* ¶ 37, Ex. F.)  Shortly thereafter, Ms. Garcia confirmed that **"[y]es, this is a done deal.  Brad [Sellenriek] will be working on the Energizer side for us. We have allocated the [Rayovac Overstock] inventory to your account . . . ."**  (*Id.* ¶ 38, Ex. F.)[1]

Over the next few months, Eminah made payments totaling over $230,000 under the Agreement.  (*Id.* ¶ 42.)  However, while Energizer delivered a portion of the Rayovac Overstock, there was no progress in setting up Eminah as a distributor in the weeks that followed.  (*Id.* ¶ 43.)  During that time, Eminah contacted Energizer to express its concerns.  (*Id.* ¶ 44.)  In response, Energizer repeatedly thanked Eminah for its "partnership and patience" and noted that Energizer

---

[1] All emphasis is added herein unless otherwise indicated.  In addition, all internal quotations, citations, and modifications are omitted herein unless otherwise indicated.

appreciated *"all you have done to assist with our rechargeable battery excess stock position."* (*Id.*, Ex. I.)   In September 2019, Energizer informed Eminah that, as a result of unidentified "strategy changes," Energizer would not supply the remaining portion of the Rayovac Overstock that had been allegedly "allocated" to Eminah's account.   (*Id.* ¶ 46, Ex. J.)   Energizer also failed to set up Eminah as a distributor of Energizer Products on the agreed terms.   (*Id.* ¶ 48.)

Following Energizer's breach of the Agreement, Plaintiffs made numerous efforts to work with Energizer to find a mutually acceptable solution.   Energizer was not interested.   Instead, Energizer sought to interfere with Plaintiffs' ability to sell Energizer Products online, *including the thousands of batteries that Energizer sold to Plaintiffs*.

### C.    Energizer's Baseless Legal Threats and Filing of False IP Complaints

As noted above, since the inception of their business in 2008, Plaintiffs have sold their goods, *inter alia*, on online marketplaces, including on Amazon and eBay.   (SAC ¶¶ 18, 55.) Energizer was well-aware of Plaintiffs' reliance on these online marketplaces.   And, following the breakdown of the Agreement, Energizer intentionally sought to interfere with Plaintiffs' ability to do business on Amazon and eBay.   In August and September of 2019, Energizer's counsel bombarded Plaintiffs with frivolous claims of intellectual property ("IP") infringement and tortious interference.   (*Id.* ¶¶ 98, 107.)   Among other things, Energizer asserted that Plaintiffs could not sell *any* Energizer Products online without violating the law.   (*Id.*)   During the Pre-Motion conference relating to the instant Motion, counsel for Energizer conceded that these threats were without merit.   (Hr'g Tr. 11:24–12:2, Apr. 27, 2020 ("THE COURT: . . . from the defense point of view, so you sell them all these batteries, *it's not your position that they couldn't go ahead and resell them, is it?* MS. NAGLE: *As to the batteries,* Your Honor, *no.*").)

After Plaintiffs refused to accede to Energizer's admittedly frivolous demands, Energizer began filing false reports of IP infringement with eBay.   (SAC ¶¶ 127–42.)   eBay provides rights

owners with a self-help tool called the Verified Rights Owner Program ("VeRO"). This tool allows rights owners to report IP violations. (*Id.* ¶ 116.) It is well-known among brand owners that eBay will act on notices of IP infringement and, as a result, rights owners often misuse the VeRO tool for anti-competitive purposes. (*Id.* ¶ 117.) VeRO members allege an infringement to eBay via a "Notice of Copyright Infringement" ("NOCI") form on eBay's site. (*Id.* ¶ 118.) Upon receipt of a NOCI, eBay removes the allegedly infringing listing or content (e.g., photos, text) with little or no review of the validity of the complaint. (*Id.* ¶ 120.) eBay penalizes sellers who have had complaints filed against them. (*Id.* ¶ 122.) Each NOCI places a "black mark" on a seller's account and additional black marks can lead to account suspension, which can be difficult to reverse. (*Id.* ¶ 123.) As alleged in the SAC, Energizer submitted multiple false NOCIs relating to Plaintiffs' listings for Energizer Products. (*Id.* ¶¶ 127–42.) Although almost a year has elapsed, Energizer's false complaints remain as black marks and continue to jeopardize Plaintiffs' accounts. (*Id.* ¶ 186.) And, despite having no justification for these reports, Energizer has refused to retract them. (*Id.*)

### D. Procedural History

As a result of Energizer's bad faith and dirty dealing, the Parties are now entangled in two related cases, both before this Court. Recognizing that ligation would ensue, Energizer initiated *Energizer Brands, LLC v. My Battery Supplier, LLC*, No. 1:19-CV-6486-AMD-CLP (E.D.N.Y.) ("the Related Case") on November 15, 2019, in which it asserts claims for trademark infringement and unfair competition. Plaintiffs filed their original complaint in this action on January 8, 2020. (ECF No. 1.) At the Court's suggestion, Plaintiffs filed an Amended Complaint (ECF No. 19) on May 8, 2020, which, *inter alia*, attached the e-mail communications referenced in the original complaint. On July 8, 2020, Plaintiffs filed their Second Amended Complaint, and, on July 22, 2020, Energizer filed the instant Motion to Dismiss. (ECF No. 24.) On July 27, 2020, the Parties filed a Joint Discovery Plan and Scheduling Order (ECF No. 25). Fact discovery is ongoing.

### III.     LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings must be construed in the light most favorable to the non-moving party. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

### IV.     THE SAC ADEQUATELY PLEADS CLAIMS I–III CONCERNING ENERGIZER'S BREACH OF CONTRACT

#### A.     The SAC Sufficiently Pleads a Claim for Breach of Contract (Count I)

 "To state a claim for breach of contract under New York law, a plaintiff must allege (1) the existence of an agreement; (2) adequate performance of the contract by plaintiff; (3) breach of the agreement by the defendant; and (4) damages." *Selective Beauty SAS v. Liz Claiborne, Inc.*, No. 09 Civ. 9764 (RMB) (HBP), 2010 U.S. Dist. LEXIS 154890, at *10 (S.D.N.Y. May 26, 2010). A valid contract requires "an offer, acceptance, consideration, mutual assent and intent to be bound." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009).

Here, the SAC adequately alleges all of the elements needed to state a claim for breach of contract, including: (1) the formation of the Agreement for distribution of Energizer Products and the purchase of the Rayovac Overstock (SAC ¶¶ 27–41); (2) Eminah's performance under the Agreement, including payment of over $230,000 (*id.* ¶ 42); (3) breach by Energizer, including its refusal to establish Eminah as a distributor or deliver the remaining Rayovac batteries (*id.* ¶¶ 43–52); and (4) damages to Plaintiffs, including lost profits, costs and fees (*id.* ¶¶ 155–60).

Energizer asserts that Plaintiffs' breach of contract claim should be dismissed because the Parties' Agreement: (1) was only an "agreement to agree"; and (2) is not enforceable under the

Statute of Frauds.  Energizer's arguments are both legally and factually meritless.

### 1.    *The Parties Agreed on All Material Terms for the Purchase of the Rayovac Overstock*

The SAC alleges, and Parties agree, that there were two components to the Agreement at issue: (1) the purchase of the Rayovac Overstock; and (2) the distribution of Energizer Products. (SAC ¶ 151.)  Energizer's Motion does not address the former—Energizer has no conceivable excuse for its failure to supply more than half of the agreed Rayovac Batteries.

"In a contract for the sale of goods, the essential terms are [1] quantity, [2] price, and [3] time and manner of delivery." *Fakhoury Enters., Inc. v. J.T. Distribs.*, No. 94 Civ. 2729 (PKL), 1997 U.S. Dist. LEXIS 7667, at *11 (S.D.N.Y. June 2, 1997).  With respect to the Rayovac Overstock, the Parties agreed to a price of $0.35 per cell for 1,114,400 1350mAh NiMH AA batteries and $0.29 per cell for 470,400 600mAh NiMH AAA batteries.  (*Id.* ¶ 31, Ex. B.)  Notably, this deal was offered from the get-go as a ***"take all price [and] agreement*,"** i.e., Eminah was required to commit to buying the whole lot.  (*Id.* ¶ 27, Ex. A.)  The final quantities were confirmed in multiple emails.  (*See id.*, Ex. B (May 3, 2019 e-mail), Ex. G (May 6, 2019 e-mail confirming that the shipment of 1,114,400 AA batteries and 470,400 AAA batteries was scheduled to be completed by September 2019).)[2]  Energizer even confirmed that it had ***"allocated the inventory to [Eminah's] account . . . ."*** (*Id.*, Ex. F.)  We now know that this representation was an outright misrepresentation.

In addition to price, quantity and delivery terms, the Parties even agreed on precisely how the Rayovac Overstock would be packaged.  Specifically, Energizer offered to provide the batteries

---

[2] The September 2019 completion date was consistent with Energizer's representations that the purchase had to be completed by the close of Energizer's fiscal year, which was to end September 30, 2019.  An issue for discovery will be whether Energizer, in fact, "booked" the full sale amount—as Energizer's employees represented—in order to improperly inflate its financials.

in "bulk," such that Eminah could repackage them for resale as it saw fit, or package them to Eminah's specifications prior to delivery. (*Id.* ¶ 27, Ex. A.)[3]  Eminah ultimately instructed Energizer to package "about 7% of the AA in 8 packs and the rest 4 packs[.]" (*Id.*, Ex. F at 4; *see also* Ex. G at 2, 4 (specifying the breakdown of battery packs and "packs per pallet").)

Thus, Plaintiffs' breach of contract claim with respect to the Rayovac Overstock should proceed. *See New World Trading Co. v. Avshalomov*, No. 11 Civ. 6219 (SAS), 2012 U.S. Dist. LEXIS 137823, at *15–16 (S.D.N.Y. Sept. 24, 2012) (denying motion to dismiss where complaint alleged quantity, price and terms of delivery for shoes); *Adore Me, Inc. v. NPC Global Corp.*, No. 18cv4498 (DLC), 2019 U.S. Dist. LEXIS 126205, at *23 (S.D.N.Y. July 29, 2019) ("unambiguous agreement with respect to delivery date . . . confirmed that the[ parties] were in agreement").

### 2. The Parties Agreed on All Material Terms for the Distribution of Energizer Products

With respect to the distribution of Energizer Products, Energizer's asserts that the SAC does not allege that the Parties agreed upon "pricing," "products and brands . . . subject to the distributorship" and "terms and conditions." (ECF No. 24-8, "Mot.," at 13–14.)  Energizer's argument is frivolous.  The Parties agreed on all of the essential terms, including product selection, pricing, and the channels of distribution. (*See* SAC ¶ 32, Ex. C.)  Specifically, the Parties agreed that Eminah would have "full product access", "most competitive pricing," and the ability to sell these products in Eminah's existing sales channels. (*Id.* ¶¶ 32–34.)

On June 3, 2019, Mr. Sellenriek **sent Eminah the applicable price and product list** and asked Eminah to "review and let [him] know **what items [Eminah would] be purchasing on [its]** ___**first order** [of Energizer Products], and their respective quantities . . . ."__ (*Id.*, Ex. H.)  Mr.

---

[3] In the Related Case, Energizer contends that Plaintiffs' resale of batteries in "bulk" packaging somehow violates the Lanham Act.  Energizer is obviously talking out of both sides of its mouth.

Sellenriek subsequently represented this was the pricing he used "with all of [his] largest customers," i.e., it was the most competitive pricing to which the Parties agreed.  (ECF No. 24-3 at 2.)  Energizer's contention that "[t]he SAC does not allege a single agreed-upon distributorship term" (Mot. at 13), is incomprehensible.

Energizer suggests that the Agreement may be "indefinite" because it lacks a specific duration.  (Mot. at 13.)  But the Agreement is "governed by well-settled New York law which provides that a contract with no stated duration is terminable only after a ***reasonable duration*** . . . ." *Italian & French Wine Co. v. Negociants U.S.A.*, 842 F. Supp. 693, 699 (W.D.N.Y. 1993); *see also Rogers v. HSN Direct Joint Venture*, 97 Civ. 7710 (LLS), 1999 U.S. Dist. LEXIS 12111, at *3 (S.D.N.Y. Aug. 5, 1999). The applicable "reasonable duration" is a question of fact that cannot be resolved on a motion to dismiss.

In short, all material terms were settled, and Eminah was ready to place its first order. Energizer's demand that the SAC or the Agreement set forth every conceivable term is wrong.  *See Selective Beauty*, 2010 U.S. Dist. LEXIS 154890, at *11 (distribution agreement sufficiently alleged where parties "expressed their mutual commitment to all the points and terms that required negotiation"); *Globaltex Grp., Ltd. v. Trends Sportswear, Ltd.*, No. 09-CV-235 (JBW), 2009 U.S. Dist. LEXIS 38302, at *10 (E.D.N.Y. May 4, 2009) (denying dismissal where "considerable support" for existence of agreement "whether by oral, written, or other communications"); *Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337, 347 (S.D.N.Y. 1992) ("New York law does not require terms of a contract to be precisely and perfectly stated to be enforceable if the parties' intentions can be determined within a reasonable degree of certainty.").

### 3.    *The Parties Had a Meeting of the Minds*

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent, [and that] [t]he best evidence of what parties to a

written agreement intend is what they say in their writing." *Greenfield v Philles Records*, 780

N.E.2d 166, 170 (2002). Here, the Parties' writings speak for themselves:

- ***On May 1, 2019 at 4:30 PM Hershel Brach writes to Krista Garcia:*** "As discussed before, I believe that my initial offer for the Rayovac lot was fair. However, as discussed, ***I will accept our final agreed purchase price for the lot, provided that I can purchase directly from your company energizer products going forward.*** In this regard, as we discussed many times I simply request the full product access, best pricing and terms I anticipate my volumes to be 2-3 million+ I plan to continue to sell in the same channels that I currently service and believe that having direct access to the products will benefit both of our companies. . . . ***Please confirm that the above is acceptable***." (SAC, Ex. C.)

- ***On May 1, 2019 at 4:58 PM Krista Garcia responds to Hershel Brach:*** "Thanks Hershel! I provided to Brad [Sellenriek] and ***he will start the process to get you set up***." (*Id.*, Ex. D.)

- ***On May 1, 2019 at 5:10 PM Brad Sellenriek e-mails Hershel Brach:*** "Hershel- Hello, this is Brad Sellenriek. We spoke on the phone earlier today regarding getting set up as a Energizer Distributor. I will be forwarding you some document that I need completed to get an account set up. ***I thank you for your time and look forward to getting set up with you***." (*Id.*, Ex. E.)

- ***On May 3, 2019 at 12:07 PM Krista Garcia writes to Hershel Brach:*** "I just talked to my director and whatever you would want to ship right away we can ship and adjust someone else's shipments. Please let me know what you may want of each size and for the AAs what you may want for a four and an eight pack. . . ." (*Id.*, Ex. F.)

- ***On May 3, 2019 at 12:23 PM Hershel Brach responds to Krista Garcia:*** "Ok will let you know next week how many to ship asap , and will get you the monthly numbers[.] [L]ets get the energizer thing done , so that the deal is completed on both ends[.] [A]lso ***please confirm that we have a done deal***, so that I can focus on this and allocate the funds, since I am looking at a few larger deals now ***and if it is not a done deal I need to know so that I can focus on others as this is a large $$$$$$$ deal***" (*Id.*)

- ***On May 3, 2019 at 12:35 PM Krista Garcia replies to Hershel Brach: "Yes, this is a done deal.*** Brad will be working on the Energizer side for us. We have allocated the inventory to your account for the rechargeables and will just need to know what you provide next week with shipments." (*Id.*)

The only reasonable conclusion from the above exchanges is that the Parties intended to

enter into the Agreement—as each side acknowledged, ***it was "a done deal."*** As can be seen, by

May 3, 2019, ***Eminah was done negotiating—it wanted confirmation that the deal was "done"***

***that day* and received that confirmation.**  *See Pelonis USA, Ltd. v. Del-Rain Corp.*, No. 94-CV-587S(F), 2000 U.S. Dist. LEXIS 15279, at *45 (W.D.N.Y. Sept. 5, 2000) (Plaintiffs letter stating that it wanted an "absolute confirmation" by the end of the week demonstrated that "it was finished negotiating"); *see also Shop Vac Corp. v. BCL Magnetics Ltd.*, No. 04-CV-262, 2005 U.S. Dist. LEXIS 26199, at *30 (N.D.N.Y. Oct. 24, 2005) (denying summary judgment of no breach of contract where "a jury may well conclude that, but for [defendant's] conduct, the sale . . . would have been a completed transaction – the classic 'done deal'").

**4.     *Energizer's Exhibits Only Highlight Its Bad Faith and Attempts to Breach the Agreement***

In an effort to obfuscate the relevant facts, Energizer attaches to its Motion a number of e-mails dated between June 2019 and October 2019 to suggest that Parties were still negotiating pricing and even disingenuously asserts that Eminah "rejected the distributorship terms" that the Parties negotiated.  (Mot. at 4.)  But, even if considered, these e-mails merely confirm that a deal was reached in May 2019 and that Energizer was simply stringing Eminah along.

Specifically, Energizer cites to Exhibits 2 and 3 to its Motion (ECF Nos. 24-3 and 24-4) to insinuate that the Parties had not reached agreement as to pricing.  (Mot. at 12–13.)  As noted above, the Parties agreed that Eminah would receive the "most competitive pricing," i.e., the same pricing as Energizer's largest distributors.[4]  (SAC ¶ 32.)  But, upon reviewing the price list Mr. Sellenriek provided on June 3, 2019, Mr. Brach expressed concern that Energizer was not keeping its end of the deal because the pricing appeared to be "way off" and, to his knowledge, was not "in line with other dist[ributors] in the area[.]"  (ECF No. 24-3; *see also* ECF No. 24-4 (noting that

---

[4] This terminology is commonly used in negotiating distributing agreements and, as reflected in the e-mails, each party understood this term.  *See Paper Corp.*, 807 F. Supp. at 347 ("In determining the intention of the contracting parties, it is proper to consider matters outside the writings, including the previous dealings between the parties and the practices of the trade.").

11

pricing was "most prob[ably] 50%+++ higher then best distributor pricing . . .").) But, as shown in these same e-mails, ***Mr. Brach urged Energizer to move forward and "[p]lease get the account opened" based on the June 3rd pricing.*** (ECF No. 24-3; ECF No. 24-4 ("Krista, please note that this is already almost a month waiting to be setup, so ***I think its in our best interests to set up the account*** . . . .").) Energizer's suggestion that Eminah rejected Energizer's pricing is contrary to the SAC and the e-mails submitted by both Plaintiffs and Energizer.[5]

Citing Exhibits 4 and 5 to its Motion (ECF Nos. 24-5 and 24-6), Energizer also suggests that Eminah refused to agree to Energizer's "terms and conditions." (Mot. at 12–13.) Energizer is not being candid with the Court. Eminah accepted the terms and conditions that were in place ***at the time that the Parties entered into the Agreement.*** Those terms were consistent with the Parties' Agreement and, for example, did not seek to interfere with Plaintiffs' ability to sell Energizer Products in Plaintiffs' existing sales channels.[6] But, during the summer of 2019, Energizer had a significant change in strategy and decided that it wanted to monopolize the online marketplaces. In addition to meritless threats of litigation against online sellers (*see* SAC ¶¶ 98, 107), Energizer created a new set of terms and conditions that included a section entitled "Restrictions."[7] These new "restrictions" sought to preclude ***all*** online sales by Energizer's own customers and were, therefore, ***directly contrary to the Parties' Agreement***, including, that Eminah would continue to sell Energizer Products in its existing sales channels. (SAC ¶ 32.) Energizer's refusal to supply Eminah with Energizer Products under the Agreement, ***unless***

---

[5] Whether the pricing attached to Mr. Sellenriek's June 3, 2019 e-mail (SAC, Ex. H) was in fact the agreed pricing (i.e., the pricing supposedly provided to Energizer's "largest customers") or whether Energizer was not being honest with Plaintiffs (and attempting to impose higher pricing), is another question for discovery.

[6] https://web.archive.org/web/20190619223046/https://www.energizerholdings.com/company/partners-suppliers/customer-terms-conditions.

[7] https://www.energizerholdings.com/company/partners-suppliers/customer-terms-conditions.

***Eminah agreed to new terms and conditions that would render the Agreement worthless,*** only further evidences Energizer's bad faith.  (*See* ECF No. 24-6.)

### 5.    The Parties' Agreement Is Not Precluded by the Statute of Frauds

Energizer argues that the Statute of Frauds operates to render the Parties' Agreement unenforceable. But, "the Statute of Frauds protects unwitting parties from certain transactions particularly susceptible to fraud. . . . It is not designed to permit parties to escape agreements they knowingly entered into through gamesmanship and mere technicalities." *Vinifera Imps. Ltd. v. Societa Agricola Castello Romitorio SRL*, No. 2:16-cv-00103 (ADS)(ARL), 2020 U.S. Dist. LEXIS 43374, at *23 (E.D.N.Y. Mar. 12, 2020).  As discussed below, the Parties e-mails constitute signed writings sufficient to satisfy the Statute of Frauds.  And, in all events, the Agreement is excepted from the Statute by the doctrine of part performance.

### a)    The Parties' E-mails Satisfy the Statute of Frauds

Energizer contends that the Agreement is unenforceable under the Statute of Frauds because "none of these allegations or emails are sufficient to state all the essential terms of a distributorship agreement . . . ."  (Mot. at 12.)[8]  Energizer's "approach is erroneous." *Vinifera Imps.*, 2020 U.S. Dist. LEXIS 43374, at *11.  "The Statute of Frauds was intended to . . . ensure the existence of a valid agreement, ***not the inclusion of every item that the parties could have conceivably included***." *Shaftel v. Dadras*, 39 F. Supp. 2d 217, 228 (E.D.N.Y. 1999).  To that end, "the statute is satisfied by some note or memorandum signed by the party to be charged that is adequate to establish an agreement when considered in light of the admitted facts and surrounding circumstances." *Henry L. Fox Co. v. William Kaufman Org., Ltd.*, 542 N.E.2d 1082, 1084 (1989).  Here, the e-mails annexed to the SAC sufficiently establish at the pleading stage that the Parties

---

[8] As noted above, Energizer does not contest that the e-mails are sufficient to establish a contract with respect to the Rayovac Overstock.

intended to form an Agreement. (*See supra* § IV.A.2.)  Construed in the light most favorable to Plaintiffs, the emails satisfy the Statute of Frauds.[9]  *See CUnet, LLC v. Quad Partners, LLC*, No. 16-cv-6327 (CM), 2017 U.S. Dist. LEXIS 36930, at *11–12 (S.D.N.Y. Mar. 7, 2017) ("In the case of an agreement written in an email, courts undertake a case-by-case analysis in determining whether the email constitutes the signed writing that satisfies the statutory requirement . . . .").

### b) *Plaintiffs' Partial Performance Renders the Statute of Frauds Irrelevant*

Energizer's attempts to weasel out of the Agreement based on the Statute of Frauds must fail for an additional reason, namely Eminah's partial performance.  This is because agreements that do not include a suitable writing (e.g., oral agreements) may be enforceable where, viewing the evidence in the light most favorable to the plaintiffs, there has been partial performance "unequivocally referable" to the contract by the party seeking to enforce the agreement.  *Pinkava v. Yurkiw*, 882 N.Y.S.2d 687, 689 (N.Y. App. Div. 2d Dep't 2009) (denying summary judgment under the statute of frauds where there was evidence supporting "that the plaintiffs' conduct was extraordinary and explainable only by a reference to the oral contract").

The doctrine of partial performance is often applied to distribution agreements, as in this case.  *See, e.g.*, *Last Time Beverage Corp. v. F &V Distrib. Co.*, 951 N.Y.S.2d 77, 82 (N.Y. App. Div. 2d Dep't 2012) (affirming holding that oral distribution agreement "should be removed from the ambit of the statute of frauds" because "plaintiffs performed substantial obligations based on the defendants' promises"); *Beautiful Jewellers Private, Ltd. v. Tiffany & Co.*, No. 06 Civ. 3085

---

[9] Plaintiffs are aware that the relevant Energizer employees, including Ms. Garcia, maintained copious notes regarding each conversation and aspect of the Parties' Agreement. Discovery will confirm that all the relevant terms were finalized, and internal approvals were obtained.  *See Al-Bawaba.com, Inc. v. Nstein Techs. Corp.*, 862 N.Y.S.2d 812, 812 (N.Y. Sup. Ct. Apr. 25, 2008) ("The series of email[s] . . . exceeds the threshold of 'mere speculation' and suggests that defendant may have internal documents or written communications containing relevant terms of the agreement sufficient to satisfy the Statute of Frauds.").

(KMW), 2007 U.S. Dist. LEXIS 20263, at *14 (S.D.N.Y. Mar. 21, 2007) (denying motion to dismiss breach of oral distribution agreement because "[a]fter discovery, [plaintiff] might be able to prove that the parties' performance demonstrates that a contract existed").

Just like the plaintiffs in *Last Time* and *Beautiful Jewellers*, Eminah performed substantial obligations based on Energizer's promises, including making payments of over $230,000 based on the promise that Eminah would become a distributor of Energizer Products.  (*See, e.g.*, SAC, Ex. C ("I will accept our final agreed purchase price for the lot, provided that I can purchase directly from your company energizer products going forward.").)  Eminah would never have entered into the Agreement or made these payments otherwise.  (*Id.*)  Indeed, Eminah explained, both in writing and during phone conversations, that the Agreement was a significant financial undertaking for Eminah and, if the deal was not "complete on both ends," it would pursue other options.  (SAC, Ex. F at 5.)  Thus, there has been "part performance unequivocally referable to the contract by" Eminah.  *Barretti v. Detore*, 944 N.Y.S.2d 166, 169 (N.Y. App. Div. 2d Dep't 2012).  Thus, even if the Parties' Agreement did not comply with the Statute of Frauds (it did), Plaintiffs' breach of contract claim readily survives dismissal.

## B.     The SAC Sufficiently Pleads a Claim for Fraudulent Inducement (Count III)

A fraudulent inducement claim under New York law requires a plaintiff to allege "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [plaintiff]; and (iv) resulting damages." *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012).  And, pursuant to Rule 9(b), a complaint must specify (1) the fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

Here, the SAC alleges that Energizer employees Katie Stein and Krista Garcia represented

that Energizer would set up Eminah as a distributor, provided that Eminah purchase the Rayovac Overstock.  (SAC ¶¶ 32, 168.)  Ms. Garcia further represented this this was a "done deal."  (*Id.* ¶ 38.)  Energizer, through Ms. Garcia, also knowingly misrepresented the available inventory of batteries (by falsely stating that Energizer ***"ha[d] allocated the inventory to [Eminah's] account"***) and the status of scheduled shipments (by stating that all shipments would be completed by September.  (*Id.* ¶¶ 38–39, Ex. G at 4.)

As alleged, Energizer knew that these representations were false at the time that they were made and had no intention of supplying the Rayovac Overstock or Energizer Products under the agreed terms.  (*Id.* ¶ 172.)  Energizer does not dispute that the "inventory" identified in Ms. Garcia's May 3, 2019 e-mail (*id.*, Ex. F) had ***not***, in fact, been "allocated" to Eminah—whether it existed at all or was sold to another customer, are questions for discovery.  *See Brook, Weiner, Sered, Kreger, & Weinberg v. Coreq, Inc.*, No. 91 C 7955, 1994 U.S. Dist. LEXIS 11401, at *12 (N.D. Ill. Aug. 3, 1994) ("alleged statement that the agreement was a 'done deal' may constitute a knowing misrepresentation of a material fact").

Energizer speculates that, "[w]hen Energizer bought Rayovac in 2019, the parties simply continued their pre-existing business relationship." (Mot. at 17.) Based on this statement, Energizer concludes that "it is not plausible that Eminah was wrongfully 'induced' into buying Rayovac batteries, something that . . . it had been doing regularly for over a decade."  (*Id.*) Energizer is wrong on both counts.  While Plaintiffs had ***contacts*** at Rayovac dating back a decade (*see* SAC ¶¶ 23–26), as of March 2019, Plaintiffs had not purchased a larger closeout deal from Rayovac in several years.  Moreover, Energizer's framing of the issue is incorrect—Plaintiffs do not allege that they were "wrongfully induced into buying Rayovac batteries" ***generally***. Rather, as alleged in the SAC, Eminah was induced into paying over $230,000 towards ***the Agreement***,

hiring additional staff to handle the additional volume, and passing on other deals. (SAC ¶ 36.)

As also alleged, Energizer's employees, perhaps unwittingly, identified Energizer's "motive" for the fraud—Energizer's desperation to complete the Rayovac Overstock deal before the close of the fiscal year. (*Id.* ¶ 28.)  Thus, the SAC "adequately pleads the particulars of who, what, when and why of a claim for common law fraud." *CCM Rochester, Inc. v. Federated Inv'rs, Inc.*, No. 14-CV-3600 (VEC), 2014 U.S. Dist. LEXIS 165136, at *10 (S.D.N.Y. Nov. 25, 2014).

Finally, Energizer asserts that Plaintiffs' "fraudulent inducement claims are duplicative of [its] breach of contract claims and cannot stand alone." (Mot. at 15.)  Because the SAC alleges misrepresentations that are collateral or extraneous to the Agreement, and alleges that Eminah was induced to enter into the Agreement by false representations of present fact, Plaintiffs' fraud claim is not duplicative of their contract claims. *See CCM Rochester*, 2014 U.S. Dist. LEXIS 165136, at *4; *see also Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 244–46 (S.D.N.Y. 2006) (allegations that the defendants failed to disclose material facts and made fraudulent misrepresentations were not duplicative of plaintiff's breach of contract claim).

### C.    The SAC Sufficiently Pleads a Claim, in the Alternative, for Unjust Enrichment (Count II)

To prove unjust enrichment, "a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). Energizer argues that "the SAC only alleges one benefit conferred on Energizer at all — the $230,000 paid by Eminah for batteries that Eminah received." (Mot. at 14.)  This is just more attorney argument. The SAC actually alleges that Energizer accepted over ***$230,000 towards the Agreement***, which required Energizer, *inter alia*, to "furnish the agreed Rayovac Overstock and . . . open Eminah's distributor account." (SAC ¶ 164.)  Eminah would never have made ***any*** of

17

these payments without a complete Agreement. (*Id.*, Ex. F.)

Further, contrary to Energizer's litigation-driven assertions here, Energizer ***repeatedly*** acknowledged that it had benefited at Eminah's expense.  (*See, e.g.*, *id.* ¶ 45 ("[w]e really appreciate . . . all you have done to assist with our rechargeable battery excess stock position.").) Although Energizer attempts to bury its head in the sand, Eminah made clear that it would incur expenses under the Agreement, including, e.g., "hir[ing] additional staff, and pass[ing] on other business opportunities."  (*Id.* ¶ 36.)  Therefore, the SAC adequately alleges that Energizer was enriched at Eminah's expense.  "[W]hether this enrichment, if proved, would 'in equity and good conscience' require defendant to make restitution are genuine issues for trial."  *L. Fatato, Inc. v. Miller Brewing Co.*, 582 F. Supp. 1377, 1379 (E.D.N.Y. 1984).

## V.   THE SAC SUFFICIENTLY PLEADS COUNTS IV–VIII CONCERNING THE FALSE EBAY REPORTS

The SAC asserts claims of unfair competition, tortious interference, defamation, and trade libel based on Energizer's false reports to eBay alleging that Plaintiffs' listings were infringing Energizer's IP rights.  In arguing that these claims were not adequately pled, Energizer ignores allegations in the SAC in favor of its own self-serving presumptions.

### A.   The SAC Sufficiently Pleads a Lanham Act Section 43(a) Claim (Count IV)

The Lanham Act serves to "protect persons engaged in . . . commerce against unfair competition," which is concerned with "injuries to business reputation and present and future sales."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 119, 131 (2014). Plaintiffs sufficiently pled that Energizer violated the Lanham Act by disseminating false and injurious statements about Plaintiffs' business and products.

As relevant here, the Lanham Act provides that a party who "uses in commerce any . . . false or misleading representation of fact" regarding "any goods or services" is liable to anyone

likely to be damaged if that false representation will likely cause confusion, mistake, or deception regarding "commercial activities by another person."  15 U.S.C. § 1125(a)(1). "The Second Circuit has adopted a three-part test to determine if the statements at issue are covered by the Lanham Act: the speech is covered if it is (1) commercial speech; (2) for the purpose of influencing consumers to buy defendant's goods or services; and, (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 248 (S.D.N.Y. 2019).  Here, the SAC sufficiently alleges each of these elements.

The SAC alleges that, in order to gain a commercial advantage, Energizer repeatedly contacted Plaintiffs' e-commerce provider, eBay, claiming that Plaintiffs were infringing Energizer's IP rights.  (SAC ¶¶ 127, 135.)  The SAC further alleges that these false complaints were made "to ensure the suspension of Plaintiffs' marketplace listings, control pricing and limit competition, even though there was no legitimacy to the complaints made."  (SAC ¶¶ 148, 181.) There is ***no other conceivable motive*** for Energizer's false statements other than Energizer's economic interests, and thus, they qualify as "commercial speech." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (commercial speech is any "expression related solely to the economic interests of the speaker and its audience").

The SAC alleges that Energizer's false reports "actually deceived eBay—its intended audience—and are likely to deceive and confuse the public (i.e., eBay's marketplace users) into believing that Plaintiffs' product listings infringe Defendants' intellectual property rights, thereby materially effecting their decision and ability to purchase Plaintiffs' products."  (SAC ¶ 180.)  The false reports resulted in the removal of listing content and "remain to this date as black marks on Plaintiffs' eBay accounts and continue to place these accounts in jeopardy of suspension."  (*Id.*

¶¶ 184–186.) Energizer, fully aware of these facts, has not retracted its false reports.

### 1.   Energizer's False Statements Were Sufficiently Disseminated

Energizer's primary argument for the dismissal of Plaintiffs' unfair competition claims is that the false eBay reports could not have been "disseminated sufficiently to the relevant purchasing public" because the reports were sent to eBay and not published to consumers. (Mot. at 18, 22–23.) But the SAC alleges that Energizer's false statements were sufficiently disseminated to the relevant purchasing public to constitute commercial advertising. (SAC ¶¶ 180–184.)

"The requisite level of circulation and the relevant purchasing public will vary according to the industry." *VG Innovations, Inc. v. Minsurg Corp.*, No. 8:10-cv-1726, 2011 U.S. Dist. LEXIS 41756, at *16 (M.D. Fla. Apr. 18, 2011). "Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough . . . ." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996). Thus, whether the false representations were sufficiently disseminated is a factual issue not amenable to determination at the pleading stage. *See Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1020–21 (S.D.N.Y. 1994) (single letter sufficient because "tainting the goodwill of plaintiff with one purchaser could easily affect another purchaser's view").

Energizer's Motion attempts to downplay the severity of its reports to eBay. (Mot. at 18.) However, the direct effect of a fraudulent report of IP infringement in the e-commerce industry is significant. "The privilege of selling on eBay . . . is highly advantageous as eBay provides third-parties with exposure to the world marketplace." (SAC ¶ 71.) Indeed, "[a]ny harm that comes to the relationship between Plaintiffs and eBay creates a potential for serious and irreparable injury to Plaintiffs." (*Id.* ¶ 80.) Energizer's reports caused Plaintiffs' listing content to be removed from eBay and continues to jeopardize Plaintiffs' eBay selling privileges. (*Id.* ¶¶ 184–186.)

The repercussions of the false eBay reports are therefore significant to Plaintiffs. For this

reason, ***courts have expressly recognized that the submission of false infringement reports to online marketplaces can constitute commercial advertising or promotion for purposes of Plaintiffs' Lanham Act claim.*** *See, e.g.*, *Garmon Corp. v. Vetnique Labs, LLC*, No. 19 C 8251, 2020 U.S. Dist. LEXIS 108603, at *17 (N.D. Ill. June 22, 2020) (denying motion to dismiss where moving party alleged to have submitted false reports of patent infringement to Amazon); *Unicorn Global, Inc. v. GoLabs, Inc.*, No. 3:19-CV-0754-N, 2020 U.S. Dist. LEXIS 48315, at *17 (N.D. Tex. Mar. 20, 2020) (same); *see also Vitamins Online, Inc. v. HeartWise, Inc.*, 207 F. Supp. 3d 1233, 1242 (D. Utah 2016) (alleged review manipulation "constitutes commercial advertising" because "that information was disseminated to all . . . potential customers that visited the product pages"); *Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F. Supp. 2d 665, 677–78 (N.D. Ill. 1998) ("[N]othing in the language of the Lanham Act specifically requires a false representation be intended to influence the ultimate consumer.").

Here, as in the above cases, Plaintiffs have pled that Energizer's false reports directly resulted in the removal of listing content and were thereby disseminated to any actual or potential customer that sought to purchase Plaintiffs' products. These allegations far exceed the requirements of notice pleading. *See Display Works, LLC v. Pinnacle Exhibits, Inc.*, No. WMN-15-2284, 2015 U.S. Dist. LEXIS 158346, at *8 (D. Md. Nov. 24, 2015) ("required level of circulation . . . inappropriate [for determination] at the motion to dismiss stage").

### 2. *The SAC Adequately Pleads that Plaintiffs Suffered Damages Due to Energizer's False eBay Reports*

Energizer argues that all of Plaintiffs' claims related to the false eBay reports can be dismissed because "none of Plaintiffs' product listings were removed from eBay as a result" of the reports, and thus it is "***impossible***" that Plaintiffs were damaged by the false reports. (Mot. at 22–24 (emphasis in original).) But, as shown by the excerpt of the eBay's policy included in

Energizer's Motion, the SAC does not "misquote the policy." (*Id.* at 24.)  As explained in the SAC, as result of reports submitted through the VeRO program, eBay can take "a range of actions including for example: administratively ending or canceling listings, hiding or demoting all listings from search results, lowering seller rating, buying or selling restrictions, and account suspension." (SAC ¶ 124.)  Each such report places a "black mark" on a seller's account and additional black marks can lead to account suspension. (*Id.* ¶ 123.)

Indeed, as explained in the SAC, Energizer's false infringement reports by were acted upon by eBay and remain as black marks on the accounts to this day. (*See, e.g.*, *id.* ¶¶ 186–187, 199, 217, 223, 231, 239–240.)  The SAC sufficiently pleads that Plaintiffs suffered damages that were proximately caused by Energizer's tortious activities, and Plaintiffs should be permitted to proceed with each of their claims in order to obtain damages and permanent injunctive relief.

**B.    The SAC Sufficiently Pleads a Claim for Unfair Competition Under New York Common Law (Count V)**

Energizer talks out of both sides of its mouth in arguing that the SAC fails to state a claim for unfair competition under the New York common law.  On the one hand, it argues that the "unfair competition claim fails for the same reason as [the] Lanham Act claim . . . because . . . unfair competition claims are ***virtual cognates*** of Lanham Act claims." (Mot. at 18.)  But Energizer then changes course and suggest that unfair competition claims can only fall under one of three categories, "[n]one of [which] are alleged here." (*Id.* at 18–19.)

Under either argument, the SAC sufficiently pleads a claim for unfair competition under New York law.  As discussed above (*supra* § V.A), the SAC sufficiently pleads a Lanham Act claim.  "It is well-established that the elements necessary to prevail on causes of action for unfair competition under New York common law mirror the Lanham Act claims," and thus Plaintiffs' unfair competition claim is sufficient for the same reasons. *Baiqiao Tang v. Wengui Guo*, No. 17

Civ. 9031 (JFK), 2019 U.S. Dist. LEXIS 201807, at *12 (S.D.N.Y. Nov. 20, 2019) (denying

motion to dismiss "unfair competition claim . . . for the same reasons as [the] Lanham Act claim").

As pled in substantial detail, Energizer has engaged, in bad faith, in a scheme to eliminate

competition and maintain pricing on online marketplace, including by making the ***knowingly false***

representations that Plaintiffs' eBay listings were infringing Energizer's IP rights.  (*See, e.g.*, SAC

¶¶ 87–91, 96–101, 117, 120–131, 134–140, 143–148; *see also supra* § V.A.)

With respect to Energizer's alternative argument that unfair competition claims can only

cover certain activities that do not encompass Energizer's activities here, "New York's law of

unfair competition is a broad and flexible doctrine that depends more upon the facts set forth than

in most causes of action."  *Advance 2000, Inc. v. Harwick*, No. 16-CV-1037S, 2019 U.S. Dist.

LEXIS 213326, at *17–18 (W.D.N.Y. Dec. 11, 2019).  "***There is no complete list of the activities***

***that are actionable as unfair competition*** and protection now extends in some cases to parties

who are not even in competition."  *Ivy League Sch., Inc. v Danick Indus., Inc.*, 999 N.Y.S.2d 797,

797 (N.Y. Sup. Ct. 2014).  As discussed above, Energizer's unlawful and deceitful actions have

interfered with Plaintiffs' ability to fairly compete in the highly dynamic eBay marketplace and

have caused substantial harm to Plaintiffs.  (*See supra* § V.A.2.)  Thus, the SAC adequately pleads

common law unfair competition under New York law.

### C.    The SAC Sufficiently Pleads a Claim for Tortious Interference with Contract and Business Relationship (Count VI)

Energizer argues that the intentional interference with contract and business relations claim

should be dismissed on the grounds that Plaintiffs have failed to allege any breach of contract or

damages resulting therefrom.  (Mot. at 20.)

Contrary to Energizer's arguments, the SAC sufficiently alleges that (1) Plaintiffs are in a

contractual (and profitable) relationship with eBay (SAC ¶ 206; *see also id.* ¶¶ 71–80); and (2)

Energizer was aware of that relationship but intentionally interfered with it by submitting false reports (*id.* ¶¶ 207–208; *see also id.* ¶¶ 83–84); (3) Energizer knew that the reports were false, but acted with specific intent to unfairly suppress competition, unlawfully increase their profits and defame Plaintiffs (*id.* ¶¶ 209, 211–213, 215–216; *see also id.* ¶¶ 87–91, 96–101, 117, 120–131, 134–140, 143–148); which (4) "directly and proximately caused disruption of Plaintiffs' relationship and contract that Plaintiffs' had with eBay" by causing the removal of Plaintiffs' listing content, placing black marks on Plaintiffs' eBay accounts, and putting these accounts at risk of suspension (*id.* ¶¶ 210, 214, 217).   Thus, allegations in the SAC are sufficient to meet the pleading requirements for both tortious interference with contract and business relations.   *See, e.g.*, *Navika Capital Grp., LLC v. Doe*, No. 14 CV 5968 (DLI) (CLP), 2017 U.S. Dist. LEXIS 2926, at *31–33 (E.D.N.Y. Jan. 6, 2017) (listing elements of tortious interference claims and recommending finding of liability), *adopted*, 2017 U.S. Dist. LEXIS 40820 (Mar. 20, 2017).

Energizer was not simply acting lawfully in pursuit of its own business interests—it knowingly and intentionally made false and defamatory statements in an effort to harm Plaintiffs. The history between the Parties detailed in the SAC, including that the fact that these reports were submitted just days after Energizer intentionally breached its Agreement with Plaintiffs, further supports Plaintiffs' allegations.   (*Id.* ¶ 115.)

### D.   The SAC Sufficiently Pleads a Claim for Defamation (Count VII)

Energizer argues that Plaintiffs' claim for defamation should be dismissed because the SAC does not sufficiently allege "that the reports ridiculed, degraded, or shamed" Plaintiffs or how the statements in the eBay reports were false.   (Mot. at 20–21.)

Energizer simply ignores the allegations of the SAC, which explain that Energizer (1) submitted at least two reports stating that Plaintiffs were violating Energizer's IP rights (SAC ¶¶ 127–129, 135–137, 221); (2) those reports were made to a third party (i.e., eBay) (*id.*); and

(3) made with actual malice or reckless disregard for the truth (*id.* ¶¶ 126, 131, 134, 140, 143–148, 224–226); (4) the reports were false (*id.* ¶¶ 130, 138–139); and (5) injured Plaintiffs' business and were defamation *per se* (*id.* ¶¶ 122–125, 222–223, 227–231). These allegations are sufficient at the pleading stage. *See, e.g.*, *Navika Capital*, 2017 U.S. Dist. LEXIS 2926, at *30 (listing five elements of defamation claim and finding allegations that defendant made knowingly false statements in e-mail sent to one of plaintiffs' customers to be sufficient).

**E.  The SAC Sufficiently Pleads a Claim for Trade Libel (Count VIII)**

Energizer argues that Plaintiffs' claim for trade libel should be dismissed because the SAC does not sufficiently allege "special damages" or that the eBay reports were "calculated to prevent others from doing business" with Plaintiffs. (Mot. at 22.) However, Energizer again ignores the allegations in the SAC, which explain, *inter alia*, how (i) Plaintiffs have invested significant efforts building a successful and reputable eBay storefront and (ii) Energizer filed false complaints to eBay—as part of their efforts to increase profits by controlling the distribution and pricing of its products—to damage Plaintiffs' reputation and goodwill, such that eBay would suspend or terminate its relationship with Plaintiffs. (*See, e.g.*, SAC ¶¶ 87–91, 96–101, 117, 120–131, 134– 140, 143–148, 237–240.) The SAC specifically explains that Plaintiffs' product listing content was removed from eBay and Plaintiffs' eBay accounts are at risk of being suspended. (*Id.* ¶ 240; *see also supra* § V.A.2 (explaining that the SAC sufficiently pleads "special damages").) Thus, the SAC meets the pleading requirements for trade libel. *See Navika Capital*, 2017 U.S. Dist. LEXIS 2926, at *28.

**VI.  CONCLUSION**

For the foregoing reasons, Energizer's Motion should be denied.

Respectfully submitted,

Dated:  August 10, 2020

*s/ Mark Berkowitz*

Anthony F. Lo Cicero
Mark Berkowitz
Sandra A. Hudak
AMSTER, ROTHSTEIN & EBENSTEIN LLP
90 Park Avenue
New York, NY  10016
Phone:  (212) 336-8000
Fax:      (212) 336-8001
E-mail:  alocicero@arelaw.com
            mberkowitz@arelaw.com
            shudak@arelaw.com

***Attorneys for Plaintiffs Eminah Properties
LLC and My Battery Supplier LLC***