UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

:

**EMINAH PROPERTIES LLC**, *et al.*,

:

Plaintiffs,

:

**MEMORANDUM DECISION**
**AND ORDER**

:

– against –

:

20-CV-148 (AMD) (CLP)

:

**ENERGIZER HOLDINGS, INC.**, *et al.*,

:

Defendants.

:

---------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

     Before the Court is the defendants' motion to dismiss the second amended complaint in which the plaintiffs bring claims for breach of contract, unjust enrichment, fraudulent inducement, unfair competition, tortious interference, defamation and trade libel. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

     In 2008, Hershel Brach and members of his family formed a battery distribution business, which operates under companies Eminah Properties LLC ("Eminah") and My Battery Supplier LLC ("MBS"). (ECF No. 22 ¶¶ 16-17.) The companies acquire and re-sell batteries and related products through various channels, including an e-commerce website, Amazon, eBay and other online marketplaces. (*Id.* ¶¶ 17-18.) Beginning in 2008, Eminah purchased Rayovac batteries directly from their manufacturer, Spectrum. (*Id.* ¶¶ 23-24.) In January of 2019, defendant Energizer Holdings, Inc. acquired Spectrum's battery business. (*Id.* ¶ 26.)

     Account managers from Energizer Holdings, Katherine Stein and Krista Garcia, contacted Eminah in March of 2019 about a large quantity of overstock Rayovac rechargeable batteries that Energizer Holdings was "desperate to sell." (*Id.* ¶ 27, Ex. A.) Stein and Garcia

said that they needed to sell the batteries before the end of the fiscal year, and told Brach that the

offer was a "take all," meaning that Eminah would have to purchase the entire lot.  (*Id.* ¶¶ 27-

28.)  Eminah initially declined the offer, but Energizer Holdings "persisted."  (*Id.* ¶ 29.)

Although it did not have an immediate need for the batteries, Eminah eventually agreed

to purchase the Rayovac batteries as long as Eminah would become a distributor of Energizer

Products.  (*Id.* ¶ 30.)  The parties settled on prices for the Rayovac batteries.  (*Id.* ¶ 31, Ex. B.)

On May 1, 2019, Brach sent the following email about the terms of the agreement:

> As discussed before, I believe that my initial offer for the Rayovac lot was fair.
> However, as discussed, I will accept our final agreed purchase price for the lot,
> provided that I can purchase directly from your company energizer products
> going forward.  In this regard, as we discussed many times I simply request the
> full product access, best pricing and terms [I] anticipate my volumes to be 2-3
> million+ I plan to continue to sell in the same channels that I currently service and
> believe that having direct access to the products will benefit both of our
> companies.  [I] can confirm that [I] currently do not sell to target Costco or best
> buy, and understand that by giving me most competitive pricing, you do not want
> me to disrupt these chains and you can feel comfortable that [I] won[']t offer them
> the energizer products, [I] will fully respect that[.]  Please confirm that the above
> is acceptable.

(*Id.* ¶ 32, Ex. C.)  The same day, Garcia acknowledged the offer, and told Brach that a sales

manager, Brad Sellenriek, "will start the process to get you set up."  (*Id.* ¶ 33, Ex. D.)  That day,

Sellenriek contacted Brach "regarding getting set up as a Energizer Distributor," and said that he

"look[ed] forward to getting set up" with Eminah.  (*Id.* ¶ 34, Ex. E.)

Eminah "made clear on multiple occasions," in writing and over the telephone, "that the

deal would require Eminah to allocate funds, hire additional staff, and pass on other business

opportunities."  (*Id.* ¶ 36, Ex. F.)  On May 3, 2019, Garcia asked how Eminah wanted the

Rayovac batteries packaged, and Brach provided instructions.  (*Id.* ¶ 35, Ex. F.)  Brach also

wrote, "[A]lso please confirm that we have a done deal, so that [I] can focus on this and allocate

the funds, since [I] am looking at a few larger deals now and if it is not a done deal [I] need to

know so that [I] can focus on others as this is a large $$$$$$$ deal." (*Id.* ¶ 37, Ex. F.) Garcia responded, "Yes this is a done deal.  Brad will be working on the Energizer side for us.  We have allocated the inventory to your account for the rechargeables . . . ." (*Id.* ¶ 38, Ex. F.) Garcia wrote the plaintiffs numerous times to confirm the details of the Rayovac battery purchase, including on May 6, 2019 when she provided details for the first shipment. (*Id.* ¶¶ 39-40, Ex. G.) Eminah made payments totaling over $230,000 under the agreement, and Energizer Holdings delivered some of the promised Rayovac batteries. (*Id.* ¶¶ 42-43.)

As for the distributorship, on June 3, 2019, Sillenriek sent a price and product list, and asked Brach which items he would be purchasing in his first order. (*Id.* ¶ 41, Ex. H.) However, there was no progress in setting up Eminah as a distributor in the weeks that followed. (*Id.* ¶ 43.) Eminah expressed its concerns to Energizer Holdings employees, who "repeatedly acknowledged Eminah's efforts" concerning the Rayovac batteries and asked Eminah to remain patient. (*Id.* ¶ 44.) On July 16, 2019, Tracy Landes, a manager, emailed Brach, "I wanted to reach out and thank you for your partnership and patience.  We really appreciate your business and all you have done to assist with our rechargeable battery excess stock position." (*Id.* ¶ 45, Ex. I.)

On September 17, 2019, Garcia informed Brach that they would not supply an outstanding portion of the Rayovac batteries due to "strategy changes." (*Id.* ¶ 46, Ex. J.) Energizer Holdings tried to "re-write" the agreement unilaterally, and said that it would only supply the batteries if Eminah agreed to new "terms and conditions." (*Id.* ¶¶ 49-51.)

Energizer Holdings did not supply all of the batteries it agreed to supply, did not fulfill its agreement to set up Eminah as a distributor, and eventually stopped responding to the plaintiffs' inquiries. (*Id.* ¶¶ 47-51.) Instead of working with the plaintiffs as agreed, the defendants

"engaged in a campaign of threats, harassment and defamation" against them as part of a "scheme to eliminate competition and maintain pricing on online marketplaces." (*Id.* ¶¶ 3, 96.)

On August 28, 2019, the defendants' counsel sent the plaintiffs a letter demanding that they remove all Energizer product listings from Amazon and other websites or online media, asserting that the plaintiffs' sale of the products was "improper" because they were not authorized resellers, and threatening legal action or enforcement action against the plaintiffs. (*Id.* ¶¶ 98-101.) On September 16, 2019, the defendants' counsel sent the plaintiffs a letter accusing them of tortious interference with a contract, and demanding that they cease and desist their unauthorized sale of Energizer products online. (*Id.* ¶¶ 107-08.) According to the plaintiffs, both letters were baseless and misstated the applicable law. (*Id.* ¶¶ 97, 102-06, 109-13.) On September 17, 2019, the plaintiffs, through counsel, informed the defendants that the claims in their letters lacked merit, and cautioned them that any attempts to interfere with the plaintiffs' business relationships with online marketplaces would violate the law and result in legal action. (*Id.* ¶¶ 114-15.)

Despite these "warnings," the defendants "began submitting false and defamatory reports to eBay," through eBay's Verified Rights Owner Program ("VeRO")—a "self-help tool" that allows intellectual property rights owners to report intellectual property violations. (*Id.* ¶¶ 115-16.) Owners can submit reports using a "Notice of Copyright Infringement" (NOCI) form on eBay's site, which requires the owner to assert (1) ownership, and (2) a "good faith belief" that a listing constitutes infringement. (*Id.* ¶¶ 118-19.) Upon receipt of a NOCI, eBay "removes the allegedly infringing listing or content with little or no review of the validity of the complaint," and notifies the seller. (*Id.* ¶ 120.)[1] Each NOCI "places a 'black mark' on a seller's account,"

---

[1] The plaintiff alleges that this is eBay's process, but recounts a different process with respect to the NOCIs submitted by the defendants.

and "black marks can lead to account suspension."  (*Id.* ¶ 123.)  eBay warns sellers that it can take "a range of actions" in response to reports submitted through VeRO, "including for example: administratively ending or canceling listings, hiding or demoting all listings from search results, lowering seller rating, buying or selling restrictions, and account suspension."  (*Id.* ¶ 124.)

On October 30, 2019, eBay sent the plaintiffs a notice stating that their "listing was reported by Energizer Brands, LLC for using their copyright or trademark materials without their permission;" the defendants reported to eBay that numerous listings were "using [the defendants'] images without authorization."  (*Id.* ¶¶ 127-28.)  The notice directed the plaintiffs to "remove and replace the images in your gallery and description that belong to the reporting rights owner" or face termination of the listings.  (*Id.* ¶ 129.)  The plaintiffs maintain that because they created the images "in many of the referenced product listings," the use of those images did not violate the defendants' rights.  (*Id.* ¶ 130.)  The plaintiffs contacted the defendants and asked them either to provide the basis for the report or submit a "retraction request" to eBay.  The defendants did not respond.  (*Id.* ¶ 134.)

The same day, eBay sent the plaintiffs a second notice informing them that their "listing was reported by Energizer Brands, LLC for offering shipping to other countries without their permission," that eight eBay listings offered Energizer's "product in Europe, in violation of their intellectual property rights regarding parallel importation," and that the plaintiffs "would face termination of these listings."  (*Id.* ¶¶ 135-37.)  This report was false.  (*Id.* ¶ 138.)  The next day, the plaintiffs contacted the defendants and instructed them to submit a retraction request and cease filing false reports with eBay.  The defendants did not respond.  (*Id.* ¶ 144.)

**STANDARD OF REVIEW**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Pleadings must be construed in the light most favorable to the plaintiff. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). A court reviewing a Rule 12(b)(6) motion to dismiss "is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference." *Williams v. Time Warner, Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) (summary order) (quoting *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)).

**DISCUSSION**

**I.     Breach of Contract (Count I)**

The plaintiffs claim that Energizer Holdings breached its agreement with Eminah, which called for: "(i) Energizer Holdings to supply, and Eminah to purchase the Rayovac Overstock; and (ii) Eminah to become a direct distributor of Energizer Products." They claim that Energizer Holdings breached the agreement by refusing to provide the agreed number of Rayovac batteries, and by failing to set up Eminah as a distributor. (ECF No. 22 ¶¶ 149-60.)

The structure of the alleged agreement is unusual. Eminah agreed to purchase Rayovac overstock batteries from Energizer Holdings, and the emails between the parties specify the "essential terms" required for a contract for the sale of goods, including the price and quantity of the batteries, the time and manner of delivery and packaging details. (*See id.* ¶¶ 31, 35, 37, 39-

6

40); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-CV-5354, 2016 WL 1274014, at *4 (E.D.N.Y. Mar. 31, 2016) ("In a contract for the sale of goods, the essential terms are quantity, price, and time and manner of delivery.") (citation and quotation marks omitted). However, as part of the same agreement, the parties agreed that Eminah would become a direct purchaser from Energizer Holdings.  (*See* ECF No. 22 ¶ 32, Ex. C.)  The parties agree that they had an agreement about the Rayovac batteries; their dispute is about the direct purchasing component of the agreement, and its effect on the validity of the agreement as a whole.

The defendants claim that the complaint does not establish a valid contract for two reasons: (1) the agreement is merely an "agreement to agree," and is therefore unenforceable, and (2) it does not satisfy the statute of frauds.  (ECF No. 24-8 at 16-20.)  I reject these challenges and conclude that the plaintiffs' claim is sufficient at this stage of the proceedings.

"There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."  *Miller v. Tawil*, 165 F. Supp. 2d 487, 492 (S.D.N.Y. 2001) (quoting *Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987)).  However, "[w]here a preliminary agreement 'expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated, the agreement may be binding.'"  *Kosher Provisions, Inc. v. Blue & White Food Prod. Corp.*, No. 04-CV-361, 2005 WL 1890039, at *3 (E.D.N.Y. Aug. 9, 2005) (quoting *Tribune, Co.*, 670 F. Supp. at 498).

The defendants claim that the alleged contract does not include all material terms of the distributorship, and was therefore only an agreement to agree.  They cite *Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02-CV-2628, 2002 WL 31398933 (S.D.N.Y. Oct. 24, 2002), in

which the court found that an "oral contract" to "permit CTI to sell Compaq products to other resellers at special, discounted pricing" and a promise from Compaq "to enter into a written agreement with" CIT was an indefinite "agreement to agree," because the parties promised to enter into an agreement in the future, and the plaintiff did not adequately plead the terms and conditions of the contract.  The defendants say that this case is like *Computech* because Eminah's requests for "full product access" and "best pricing and terms" do not show the pricing, products and brands, or terms and conditions of the distributorship.

The contract in *Computech*, however, was oral.  In this case, the parties specified in emails that they had a "done deal," and that Energizer had started setting Eminah up as a distributor; there is no suggestion that they were contemplating a subsequent written agreement. In addition, the email exchanges include key terms about Eminah's distributorship; the emails memorialize the agreement to "full product access, best pricing and terms," and that Eminah would not offer the batteries in certain channels.  The emails also state the nature of the agreement as a whole: that Eminah would purchase the entire lot of Rayovac overstock batteries at a higher price than it considered fair in exchange for becoming a distributor.  (ECF No. 22 ¶¶ 30-41, Exs. B-H.)  That there were additional forms to complete and price lists to review in placing specific orders does not render the agreement unenforceable.  *See Kosher Provisions, Inc.*, 2005 WL 1890039, at *3.

Under New York law, "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."  N.Y. U.C.C. § 2-201.  A contract that "[b]y its terms is not to be performed within one year from the making thereof" and

8

"distributorship agreements of indefinite duration" must also be memorialized in writing. *See* N.Y. Gen. Oblig. Law § 5-701; *Oneida Grp. Inc. v. Steelite Int'l U.S.A. Inc.*, No. 17-CV-957, 2017 WL 1954805, at *20 (E.D.N.Y. May 10, 2017). "To satisfy the Statute of Frauds, a writing must identify the parties, describe the subject matter, state all the essential terms of an agreement, and be signed by the party to be charged." *KJD, Inc. v. Queens Ballpark Co., Inc.*, No. 15-CV-507, 2017 WL 1233843, at *2 (E.D.N.Y. Mar. 24, 2017) (citations, quotation marks and alterations omitted). "The Statute of Frauds was intended to prevent fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury and to ensure the existence of a valid agreement, not the inclusion of every item that the parties could have conceivably included. . . . To that end, the statute is satisfied by some note or memorandum signed by the party to be charged that is adequate to establish an agreement when considered in light of the admitted facts and surrounding circumstances." *Vinifera Imports Ltd. v. Societa Agricola Castello Romitorio SRL*, No. 16-CV-103, 2020 WL 1184962, at *4 (E.D.N.Y. Mar. 12, 2020) (citations and quotation marks omitted).

The defendants claim that the email exchanges do not satisfy the Statute of Frauds because they do not include all the terms of the distributorship component of the agreement. The emails, however, contain sufficient details to satisfy the Statute of Frauds. As discussed above, they list the details of the Rayovac purchase, as well as key details of the distributorship, and memorialize the scope of the agreement.

Citing material not attached to the complaint, the defendants also argue that Eminah's subsequent rejection of terms of the distributorship bolsters their position that the initial terms were not sufficient. To buttress this argument, the defendants submitted five exhibits, three of which contain emails from the same email threads that the plaintiffs attached to their complaint,

and two of which contain additional emails that were part of the parties' negotiations.  (*See* ECF Nos. 24-2-24-6.)  In a June 3, 2019 email, Sellenriek stated that the defendants would "start the account set up process" after Brach sends a document.  (ECF No. 24-2.)  In two emails from the same day, Brach expressed his concerns about pricing, and said it was "way off," but also said that he thought it would be best to set up the account since it had been "almost a month waiting to be setup."  (ECF Nos. 24-3, 24-4.)  In a September 17, 2019 email, Brach said, "I disagree with this cancelling the deal and restrictions."  (ECF No. 24-5.)  Brach sent an October 7, 2019 email to Garcia, which read, "As explained, before agreeing to the Terms and Conditions, we need clarity regarding pricing.  In particular, I need the same pricing that others have, as we agreed earlier this year, in order for me to be competitive in the marketplace."  (ECF No. 24-6.)

Even if these emails are "integral" to the complaint, *see Williams*, 440 F. App'x at 9, they do not undermine the plaintiffs' allegations that the parties had decided on, and memorialized in writing, the essential terms of their agreement: Eminah would purchase a specific quantity of Rayovac batteries, and Energizer Holdings would make it a distributor.  The emails could suggest that the defendants were not honoring their agreement to give Eminah competitive pricing, or that Eminah backed out of the distributorship.  Either way, they do not show that the initial terms were insufficient under the Statute of Frauds.

In any event, the plaintiffs have sufficiently alleged that their partial performance would render the Statute of Frauds defense inapplicable.  Partial performance removes some agreements from the ambit of the Statute of Frauds if the performance is "unequivocally referable" to the agreement.[2]  *See Fisher Sci. Co. L.L.C. v. Ortho-Clinical Diagnostics, Inc.*, No.

---

[2] The parties did not specify which Statute of Frauds provision applies, although the defendants argue generally that the agreement was of "indefinite" duration.  This issue is relevant to the plaintiffs' partial performance argument.  *Compare Wexler v. Allegion (UK) Ltd.*, No. 16-CV-2252, 2018 WL 1626346, at *11 (S.D.N.Y. Mar. 30, 2018) (the UCC "has been applied to distributorship agreements which

18-CV-3088, 2019 WL 1427564, at *4 (S.D.N.Y. Mar. 29, 2019).  The plaintiffs allege that they agreed to buy the Rayovac batteries at a higher price in exchange for becoming a distributor. Under that agreement, they paid $230,000 for batteries.  The plaintiffs have therefore alleged that this payment is "unequivocally referable" to their agreement with the defendants.

## II.    Unjust Enrichment (Count II)

To establish unjust enrichment, a plaintiff must show "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (citation and quotation marks omitted).  The plaintiffs allege that they paid, and Energizer accepted and retained, $230,000—a higher price than the plaintiffs considered fair for the batteries alone—so that Eminah would become a distributor.  The plaintiffs have adequately alleged that the overpayment on the batteries is a benefit that the defendants received at the plaintiffs' expense that requires restitution.

## III.    Fraudulent Inducement (Count III)

A party pleads a fraudulent inducement claim by alleging "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages."  *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) (citation and quotation marks

---

necessarily involve the purchase of more than $500 of goods") *with Oneida Grp. Inc. v. Steelite Int'l U.S.A. Inc.*, No. 17-CV-957, 2017 WL 1954805, at *20-21 (E.D.N.Y. May 10, 2017) ("case law is clear that distributorship agreements of indefinite duration are governed not by the Statute of Frauds provision in the New York Uniform Commercial Code, but by the New York General Obligations Law," and "it is well settled that part performance by one party does not take a contract . . . out of the statute of frauds of the [General Obligations Law]") (citations, quotation marks and alterations omitted).  Absent any mention of the plaintiffs' partial performance argument by the defendants, and reading the allegations in the light most favorable to the plaintiff, I find that the agreement could be construed primarily as one for the sale of goods, and not a distributorship agreement of indefinite duration, and therefore that the partial performance argument is applicable.

omitted). In addition, Rule 9(b)—which applies to fraudulent inducement claims—"requires allegations of 'particularity' that give rise to a strong inference of fraudulent intent." *Radiology & Imaging Specialists of Lakeland, P.A. v. FUJIFILM Med. Sys., U.S.A., Inc.*, No. 20-CV-4117, 2021 WL 149027, at *4 (S.D.N.Y. Jan. 15, 2021). "However, '[m]isrepresentations made to induce a party to enter a contract,' like misrepresentations made by the contracting party itself, 'are not actionable as fraud [ ] unless they are 'collateral' to the contract induced.'" *Khurana v. Wahed Inv., LLC*, No. 18-CV-233, 2020 WL 364794, at *12 (S.D.N.Y. Jan. 8, 2020) (quoting *Spinelli v. Nat'l Football League*, 903 F.3d 185, 209 (2d Cir. 2018)), *report and recommendation adopted*, 2020 WL 364022 (S.D.N.Y. Jan. 22, 2020).

The plaintiffs' fraudulent inducement claim is based on allegedly false representations by Stein, Garcia and Landes representing that Energizer Holdings would set up Eminah as a distributor. (*See* ECF No. 22 ¶¶ 167-74.) In other words, the plaintiffs allege that the defendants falsely represented that they would abide by the contract. In their opposition, the plaintiffs claim that Garcia also misrepresented the available inventory of the batteries and the shipment schedule, but these statements concern whether the defendants intended to supply the Rayovac batteries as agreed under the contract.[3] Accordingly, these are not "collateral" representations sufficient to state a fraudulent inducement claim, and this claim is dismissed. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Monarch Payroll, Inc.*, No. 15-CV-3642, 2016 WL 634083, at *4 (S.D.N.Y. Feb. 17, 2016) ("A present intent to deceive must be alleged and a mere misrepresentation of an intention to perform under the contract is insufficient to allege fraud.") (citation and quotation marks omitted).

---

[3] As alleged, the fraudulent inducement claim is based on representations "that Energizer Holdings would . . . set up Eminah as a distributor." (ECF No. 22 ¶ 168.) The complaint does not allege in the fraudulent inducement claim or elsewhere that Garcia's statement about allocating inventory to Eminah's account was false.

IV.    **False or Misleading Representation and Unfair Competition under the Lanham Act (Count IV)**

The plaintiffs' Lanham Act claim is based on the defendants' submission of false infringement reports to eBay.  (*See* ECF No. 22 ¶¶ 175-95.)  The Lanham Act provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  The parties agree that the Second Circuit's "commercial advertising or promotion" standard applies to this claim.  (*See* ECF No. 24-8 at 23-24; ECF No. 27 at 25-28.) Under that standard, "a statement must be: (1) commercial speech, (2) made for the purpose of influencing consumers to buy defendant's goods or services, and (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public."  *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (citations and quotation marks omitted); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 248 (S.D.N.Y. 2019) (same).

The defendants claim that Count IV must be dismissed because the plaintiffs have not alleged that eBay or Energizer shared the infringement reports, or that the reports were otherwise disseminated to customers in any way.  (ECF No. 24-8 at 23-24.)  The plaintiffs respond that they adequately pled dissemination by alleging that the "false reports directly resulted in the

removal of listing content and were thereby disseminated to any actual or potential customer that sought to purchase [the] [p]laintiffs' products."  (ECF No. 27 at 28.)

The complaint alleges that the defendants made these reports to "advance their business interests by removing [the] [p]laintiffs' listings and listing content from the eBay marketplace," that eBay's typical process upon receipt of a NOCI is to remove the allegedly infringing listing or content, and that, in this instance, eBay asked the plaintiffs to remove infringing content in response to the defendants' complaints.  (ECF No. 22 ¶¶ 120, 129, 136, 181.)  It does not allege that eBay removed the plaintiff's listings, but does state that the defendants' actions "caused the removal" of unspecified "listing content."  (*See id.* ¶ 214.)  The plaintiffs' theory is that because "eBay educates its users that product listings and listing content removals occur due to a request from a rights owner," the defendants' reports were therefore "disseminated . . . to all of [the] [p]laintiffs' actual or potential customers that visited [their] eBay product listing pages for Energizer products."  (*See id.* ¶¶ 183-84.)

The plaintiffs' conclusory allegations about the chain of dissemination are insufficient to withstand the motion to dismiss.  They do not sufficiently allege that removal of content from a listing results in a dissemination to customers of private complaints; indeed, the complaint does not allege which content was removed.[4]

The plaintiffs cite cases in which courts declined to dismiss Lanham Act claims based on infringement reports made to online marketplaces.  *See Garmon Corp. v. Vetnique Labs, LLC*, No. 19-CV-8521, 2020 WL 3414983, at *6 (N.D. Ill. June 22, 2020) (allegations that the defendant "falsely told Amazon—its intended audience—that the plaintiffs had infringed [a]

---

[4] With their motion to dismiss, the defendants submitted an email from a member of eBay's VeRO team that states that the plaintiffs' listings were never removed.  (ECF No. 24-7.)  I do not need to consider this submission in reaching my decision.  In any event, in their opposition, the plaintiffs do not appear to dispute that the listings were never removed.  (*See* ECF No. 27.)

patent and that Amazon was deceived by that statement and removed the plaintiffs' products from its website as a result" were "sufficient to state a claim of unfair competition"); *Unicorn Glob., Inc. v. GoLabs, Inc.*, 447 F. Supp. 3d 535, 545 (N.D. Tex. 2020) (allegations of false representations to "customers, including Amazon and Walmart," which resulted in product removal from Amazon's online site "multiple times" and eventually delisting of products were sufficient to state a claim). In these cases, the courts construed the marketplaces themselves—Amazon and Walmart—as the "intended audience" of the statements, *see Garmon Corp.*, 2020 WL 3414983, at *6, or the "customers" themselves, *see Unicorn Glob., Inc.*, 447 F. Supp. 3d at 545. But neither of these cases addressed the Second Circuit's standard—which requires dissemination to the "purchasing public," and which the parties agree applies here—and in both cases, unlike in this case, there were allegations that product listings were removed. The plaintiffs have not alleged facts that support an inference that eBay is itself the "purchasing public," and, as discussed above, their theory of dissemination through removal of unspecified "listing content" is untenable.

**V.    Unfair Competition under New York Law (Count V)**

For the same reasons, the plaintiffs' state law unfair competition claim is also dismissed. *See Weight Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 381 (S.D.N.Y. 2019) ("For the reasons already explained as to the Lanham Act trademark and unfair competition claims, the Complaint's common-law unfair competition claim is dismissed in its entirety."); *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, No. 18-CV-5290, 2019 WL 1768965, at *11 (S.D.N.Y. Apr. 4, 2019) ("Because the Court has found Lutron's [Lanham Act false advertising claim] to be wanting, so too must the Court dismiss its cause of action for unfair competition [under state law]."); *Ebony Media Operations, LLC v. Univision Commc'ns Inc.*, No. 18-CV-11434, 2019

WL 8405265, at *6 (S.D.N.Y. June 3, 2019) ("Plaintiff's state law claims are dismissed for the

same reasons.") (citing *Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F. Supp. 267, 282 (S.D.N.Y.

1992) (finding that the "same First Amendment considerations that limit a cause of action under

the Lanham Act apply also to a cause of action under New York law")).

## VI.   Tortious Interference (Count VI)

The plaintiffs allege claims for tortious interference with respect to their contract and

business relationship with eBay.  (ECF No. 22 ¶¶ 204-19.)  Under New York law, the elements

of a claim for tortious interference with contract are "[1] the existence of a valid contract

between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3]

defendant's intentional procurement of the third-party's breach of the contract without

justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox

News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith

Barney Inc.*, 88 N.Y.2d 413 (1996)) (internal quotation marks omitted).  The plaintiffs' tortious

interference with contract claim is dismissed because the plaintiffs do not allege any actual

breach of their contract with eBay.

To allege tortious interference with a business relationship, a "plaintiff must allege that

(1) it had a business relationship with a third party; (2) the defendant knew of that relationship

and intentionally interfered with it; (3) the defendant acted solely out of malice, or used

dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the

relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (citation and

quotation marks omitted).  The defendants argue that this claim must be dismissed because the

complaint does not allege any injury to the plaintiffs' relationship with eBay.  (ECF No. 24-8 at

26.)  In response, the plaintiffs cite their allegations that the defendants' actions caused the

removal of "listing content," placed "black marks" on their eBay accounts, and put their accounts at risk of suspension.  (ECF No. 27 at 31 (citing ECF No. 22 ¶¶ 210, 214, 217).)

The plaintiffs do not sufficiently allege an injury to their relationship with eBay for the purpose of stating a tortious interference claim.  The plaintiffs' conclusory allegation that the defendants' "actions interfered with [the] [p]laintiffs' business relationship with eBay" does not say how the relationship with eBay was damaged, nor do their allegations about what happened to their accounts.  *See RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 198-99 (S.D.N.Y. 2011) ("SCVNGR's only allegation as to injury was that [a third party] removed the Mark from the promotional material it controlled and requested that SCVNGR do the same.  Rather than causing a breakdown in the business relationship between Bremer and SCVNGR, the Counter-Defendants' interference left the underlying relationship undisturbed. . . .  The allegations are therefore insufficient to support the injury element of the tortious interference claim."); *Radiancy, Inc. v. Viatek Consumer Prod. Grp., Inc.*, 138 F. Supp. 3d 303, 328 (S.D.N.Y. 2014), *as amended* (Apr. 1, 2014) ("ShopNBC sold Viatek's product on its website, evidencing that there was a relationship between the two entities. . . .  Radiancy clearly knew the relationship existed because it sent a letter to ShopNBC to inform it that Viatek's product was infringing Radiancy's patent. . . .  Viatek does not allege in its Counterclaims that the actions taken by Radiancy caused the end of the business relationship that it enjoyed with ShopNBC. . . .  Absent allegations that Radiancy's conduct caused the deterioration of the business relationship between Viatek and ShopNBC, Viatek's claim for tortious interference fails.").

## VII.   Defamation (Count VII)

"Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault,

17

(4) falsity of the defamatory statement, and (5) special damages or *per se* actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

The defendant moves to dismiss this claim on four grounds: (1) there are "no allegations of public exposure to the VeRO reports," (2) eBay was not induced into an "evil opinion" of the plaintiffs, (3) the plaintiffs do not plead facts that show that the statements were false, and (4) there is a "lack of alleged harm." (ECF No. 24-8 at 26-27.)  I conclude that the plaintiffs' claim withstands these challenges.

First, "public exposure" is not required to state a defamation claim; publication to a third party, in this case eBay, is sufficient. *See Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001) ("Under New York defamation law, 'publication is a term of art . . . A defamatory writing is not published if it is read by no one but the one defamed.  Published it is, however, as soon as read by any one else.'") (quoting *Ostrowe v. Lee*, 256 N.Y. 36, 38, (1931) (Cardozo, C.J.)).

Second, the defendants' argument that eBay was not "induced into an 'evil opinion'" of the plaintiffs appears to be based on eBay's actual reaction, not on whether the statements are defamatory.  Even if eBay did not have an "evil opinion" of the plaintiffs, "[a] statement about a business is defamatory if it imputes to the business some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform its duties." *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 244 (S.D.N.Y. 2013) (citation, quotation marks and alterations omitted).  Here, the plaintiffs allege that the defendants falsely claimed that the plaintiffs were committing trademark infringement.  *See Mintz v. Mktg. Cohorts, LLC*, No. 18-CV-4159, 2019 WL 3337896, at *6 (E.D.N.Y. July 25, 2019) (statements alleging that someone is "a thief who stole their work" are "likely actionable"); *GeigTech E. Bay LLC*, 2019 WL 1768965, at *9 (statements that "Lutron did not invest the time, effort, and resources necessary to innovate its

18

own products, including its Palladiom shading system, that Lutron's products and commercial
activities include the violation of GeigTech's intellectual property rights, and that GeigTech is
suing Lutron for patent infringement" formed basis of defamation claim).

Third, the plaintiffs have adequately pled the falsity of the statements; indeed, their main
contention is that the infringement claims were false, and they explain why the complaints
lacked a basis in law and fact.  *See GeigTech E. Bay LLC*, 2019 WL 1768965, at *9 ("As should
be readily clear to the parties by now, Lutron's core contention is that Geigtech and Geiger lied.
They purportedly did not believe that Lutron was engaged in patent infringement, they had
reason to know Lutron was not engaged in patent infringement, and they . . . proliferate[d] the
allegedly defamatory message that Lutron was engaged in patent infringement.").

Finally, the defendants' "lack of harm" claim does not address the plaintiffs' allegations
of defamation *per se*.  *See Mintz*, 2019 WL 3337896, at *6 ("[The plaintiff] sufficiently alleges
defamation *per se* because the relevant statements tend to injure [her] in . . . her trade, business
or profession . . . by imputing to [her] a kind of fraud, dishonesty, and misconduct in her
business.") (citations, quotation marks and alterations omitted).

## VIII.    Trade Libel (Count VIII)

"Under New York law, trade libel or product disparagement is an action to recover for
words or conduct which tend to disparage or negatively reflect upon the condition, value or
quality of a product or property. . . .  To state a claim for trade libel, a plaintiff must adequately
plead (1) falsity of the statement, (2) publication to a third person, (3) malice (express or
implied), and (4) special damages."  *Enigma Software Grp. USA, LLC v. Bleeping Computer
LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016) (citations, quotation marks and alterations
omitted).

The plaintiffs have not adequately pled special damages.  "An adequate pleading of special damages must clear several hurdles.  First, special damages are limited to losses having pecuniary or economic value, and must be fully and accurately stated, with sufficient particularity to identify actual losses. . . .  In addition, special damages must be the natural and immediate consequence of the disparaging statements to be recoverable."  *Soter Techs., LLC v. IP Video Corp.*, No. 20-CV-5007, 2021 WL 744511, at *13 (S.D.N.Y. Feb. 26, 2021) (citations and quotation marks omitted).  The plaintiffs' allegations—that "listing content" was removed, and that there is a risk of account suspension—do not clear these hurdles.  The plaintiffs have not alleged with any specificity the monetary damages, if any, that flowed directly from the defendants' reports.  *See id.* ("Pleading damages of 'at least $1990,' with no further explanation, falls short of the requirement to plead damages with particularity.") (collecting cases in which alleging damages figures without additional specificity did not suffice).  Nor have the plaintiffs alleged that the reports induced anyone to refrain from conducting business with them.  *See Sandler v. Simoes*, 609 F. Supp. 2d 293, 302 (E.D.N.Y. 2009) ("A party alleging trade libel must establish that the communication was a substantial factor in inducing others not to conduct business with it and, unlike libel *per se*, must adduce proof of special damages in the form of lost dealings.").

## CONCLUSION

For the reasons stated above, I grant in part and deny in part the defendants' motion to dismiss the second amended complaint.  Counts III, IV, V, VI and VIII of the second amended complaint are dismissed.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
         March 31, 2021